**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

MARK H. ANDREW, M.D.,

                    Plaintiff,

vs.

HAMILTON COUNTY PUBLIC
HOSPITAL, d/b/a VAN DIEST
MEDICAL CENTER, and LORI
RATHBUN,

                  Defendants.

No. C 17-3053-MWB

**OPINION AND ORDER
REGARDING DEFENDANTS'
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

_____

**TABLE OF CONTENTS**

I.     **INTRODUCTION**...................................................................2
    A.    *Factual Background* ....................................................2
        1.    *The parties*.........................................................2
        2.    *Dr. Andrew's employment agreement and amendments*............3
        3.    *Dr. Andrew's employment* ...................................5
        4.    *Concerns and investigations*.................................7
        5.    *The termination and aftermath* .........................12
    B.    *Procedural Background* .........................................14

II.    *LEGAL ANALYSIS* ..................................................16
    A.    *Summary Judgment Standards*...............................16
    B.    *The Age Discrimination Claims*.............................17
        1.    *Arguments of the parties*...................................18
        2.    *Analysis* .......................................................21
            a.    *Applicable standards* ............................21
            b.    *Application of the standards* ...................23
    C.    *Retention Of Jurisdiction* ......................................28

III.   *CONCLUSION* ............................................................31

A general surgeon who was employed by a rural county hospital brought this lawsuit against the hospital and its chief executive officer asserting that his termination, allegedly arising from concerns about his prescribing practices and patient care issues, was in breach of contract, a breach of fiduciary duty, and a violation of state and federal age discrimination laws, and that reports of his allegedly improper prescribing practices to the state board of medicine and the National Practitioner Data Bank were defamatory and libelous *per se*. The defendants have moved for summary judgment on parts of the surgeon's claim of breach of contract and on his other claims in their entirety. I must decide if the surgeon has generated genuine issues of material fact on the challenged claims.

## I. INTRODUCTION
### A. Factual Background

This statement of the factual background does not necessarily set out all the parties' factual allegations in support of and resistance to the defendants' Motion For Partial Summary Judgment. Rather, it focuses on the key facts to put in context the parties' disputes. Unless otherwise indicated, the following facts are undisputed, at least for purposes of summary judgment.

### 1. The parties

Plaintiff Dr. Mark Andrew was employed as a general surgeon by defendant Hamilton County Public Hospital, doing business as Van Diest Medical Center (VDMC), in Webster City, Iowa, from 2008 until he was terminated on December 15, 2016. For much of Dr. Andrew's employment with VDMC, he also served on the hospital's medical executive committee.

Defendant Lori Rathbun was the Chief Executive Officer (CEO) of VDMC from January 2014 through June 2017, when she resigned for health reasons. As CEO, Ms. Rathbun's duties included managing VDMC, hiring physicians, promoting patient safety and quality of care, negotiating employment contracts, and terminating VDMC employees. Although she was not a physician, Ms. Rathbun frequently made decisions that involved medical issues. She relied on advice from the President of VDMC's Medical Executive Committee, VDMC's Chief Nursing Officer, and her medical staff consultant, who were Dr. Nicole Ehn, Lisa Ridge, and Dr. Scott Altman, respectively, at the pertinent time. Ms. Rathbun passed away on February 21, 2018. Lisa Ridge, who had been VDMC's Chief Nursing Officer, is now the CEO of VDMC.

### 2. *Dr. Andrew's employment agreement and amendments*

At times relevant, here, Dr. Andrew's employment with VDMC was governed by a contract (Agreement), executed on August 11, 2014, by Dr. Andrew and Ms. Rathbun. The Agreement was for an initial three-year term and would automatically renew for an additional three years, unless either party gave ninety days' notice of intent not to renew. Defendants' Appendix at 99 (Agreement, § 9, "Term and Termination"). The parties agree that the most relevant terms of the Agreement are the following ones, which pertain to termination:

> This Agreement may be terminated prior to the expiration of any Term as follows:
>
> a. **Without Cause**. Either party may unilaterally terminate this Agreement without cause at any time by notifying the other party in writing of its intention to terminate at least 90 days prior to termination. In the event Hospital terminates this Agreement pursuant to this Section 9(a) Hospital may, at its option, relieve Physician of his duties under the Agreement during the notice period. If Hospital elects this option, Physician will continue to be eligible for employee benefit plans and will receive his compensation

3

payments in accordance with Exhibit B during the notice period. Any bonuses owed to Physician pursuant to this Agreement will be determined and pro-rated based on the date Physician is relieved of his duties.

* * *

d. **Immediate Termination By Hospital**. This Agreement shall terminate immediately in the event Physician fails to meet any of the qualifications provided in Section 3 of this Agreement or if Hospital determines in good faith that:

(i) Physician is not providing adequate patient care or the safety of patients is jeopardized[.]

Defendants' Appendix at 99-100. The Agreement also includes, *inter alia*, other grounds for immediate termination not at issue here, *id.* at 100 (Agreement, § 9(d)(ii)-(ix)), as well as a provision concerning "For Cause Termination," upon thirty days' notice, and a provision concerning termination for "Insolvency" of VDMC. *Id.* (Agreement, § 9(e)-(f)).

In a provision regarding "Effect of Termination," the Agreement also states,

Termination of Physician's employment shall be governed solely by this Agreement and shall not be subject to the corrective action, termination or grievance procedures applicable to other employees of Hospital or to the hearing and appeal procedures set forth in the medical staff bylaws.

Defendants' Appendix at 101 (Agreement, § 9(h), last sentence). Dr. Altman testified in deposition that "a system evolved where there's medical leadership and there's hospital leadership, and they have sort of a co-equal relationship. And the medical leadership's job is to ensure quality of care and the administrative leader's role is to ensure the delivery of care." The defendants admit that there was a peer review procedure, pursuant to hospital staff bylaws, and that the peer review procedure had been used several times

prior to December of 2016, but they deny that the peer review procedure was applicable to Dr. Andrew because of the last sentence of § 9(h) of his Agreement.

The Agreement was amended twice, once by an amendment executed on December 15, 2015, and again by an amendment executed on October 24, 2016. Both amendments reduced Dr. Andrew's compensation, but did not change the provisions quoted, just above, or change the three-year term of the Agreement.

### 3. Dr. Andrew's employment

The parties agree that Dr. Andrew was a highly-paid member of the VDMC staff, which Dr. Andrew contends was appropriate in light of his education and training as a general surgeon, his thirty-one years of experience in the field, and his countless hours on call. Dr. Andrew had discussed with Ms. Rathbun his plan to retire at age 65, at the end of 2019. Dr. Andrew alleges that, from the beginning of Ms. Rathbun's employment, she made clear that she thought he was overpaid, but the defendants admit only that Ms. Rathbun informed Dr. Andrew that his productivity did not meet hospital standards for what he was being paid. Ms. Rathbun's concerns with Dr. Andrew's productivity prompted the two amendments to Dr. Andrew's employment Agreement in December 2015 and October 2016. The parties dispute whether Dr. Andrew agreed, at the time, that the reductions were justified on the basis of low productivity. Dr. Andrew contends that several years of administrative actions at VDMC led to low referrals from area physicians to VDMC. Nevertheless, Dr. Andrew estimates that, over the course of his career, he performed over 7,000 procedures, and from 2012 to 2016, Dr. Ehn personally referred 30 to 50 cases to him.

In the summer of 2012, Dr. Andrew began providing backup call coverage at Hanson Family Hospital in Iowa Falls, Iowa. In 2014, Dr. Andrew was contracted to cover call on alternating weekends at Hanson Family Hospital, which gradually morphed into clinic days and then developed into a supplemental contract for shared services with

Iowa Falls. In late 2015, Ms. Rathbun leased Dr. Andrew's surgical services to Hansen Family Hospital. Dr. Andrew remained employed by VDMC, and Hansen Family Hospital reimbursed VDMC for Dr. Andrew's surgical services. Under the lease arrangement, Dr. Andrew spent approximately 50% of his time providing services at Hansen Family Hospital. The defendants contend that leasing Dr. Andrew's services to Hansen Family Hospital was an effort to improve his productivity, which Dr. Andrew denies. The parties agree that Ms. Rathbun planned to continue to lease Dr. Andrew's services to Hansen Family Hospital throughout the duration of his contract because it was a good source of revenue for the hospital.

In the summer of 2016, after Ms. Rathbun had agreed to lease Dr. Andrew's services to Hansen Family Hospital, she hired Dr. Gayette Grimm, a general surgeon, on a part-time basis to provide general surgery services and OB call coverage. The defendants contend that Ms. Rathbun hired Dr. Grimm primarily because Dr. Andrew was spending approximately 50% of his time providing services to Hansen Family Hospital, but also to help increase VDMC's revenue and as part of VDMC's long-term planning for surgical coverage after Dr. Andrew's retirement. Dr. Andrew, alleges, however, that Ms. Rathbun required that all new cases be referred to Dr. Grimm, which made it impossible for Dr. Andrew to improve his productivity. The defendants deny that all new cases were to be referred to Dr. Grimm. Rather, they allege that new referrals were made to Dr. Grimm if she was scheduled to work on that day, because she was designated as the "primary" at VDMC. The defendants allege that, before Dr. Grimm was hired, VDMC had to rely on a single provider—Dr. Andrew—for all surgical coverage and had been using an expensive locum tenens service to cover when Dr. Andrew was unavailable. Dr. Andrew counters that, if he was unavailable, the surgical call coverage was generally left uncovered, while another medical group covered caesarean section calls.

In the fall of 2016, VDMC made the decision to hire its own OB/GYN, and eventually hired Dr. Bedi in November 2016 to provide OB/GYN services for VDMC. Dr. Bedi had previously been part of an independent group with which VDMC had contracted to provide such services. He was not a general surgeon, like Dr. Andrew, and the only overlap in duties between the two was the performance of caesarean sections.

### 4.    *Concerns and investigations*

Ms. Rathbun testified in deposition that Lisa Ridge, the Chief Nursing Officer, learned that, on November 15, 2016, a pharmacist at HyVee notified VDMC's Quality Manager, Peggy Roberts, that she had concerns about the prescriptions that Dr. Andrew had been writing for one of his patients, T.C. Ms. Rathbun testified that it was "very unusual" for an outside pharmacist to call and highlight a concern to the quality manager at a hospital. Dr. Andrew contends that both of these statements are hearsay. It is undisputed that Dr. Andrew treated T.C. from July of 2012 until November of 2016, which Dr. Andrew admits was an unusually long time for a general surgeon to treat a patient, and that he assumed pain management care for T.C., even though he was not a pain specialist. Dr. Andrew alleges, however, that the time period was not unreasonable in light of T.C.'s surgical issues, and he denies that he violated any standard of practice in providing pain management to T.C. After Ms. Ridge brought the pharmacist's concern to Ms. Rathbun's attention, Ms. Rathbun directed that Ms. Ridge promptly commence an investigation.

Ms. Ridge examined T.C.'s medical chart and his report from the Prescription Monitoring Program (PMP). The PMP is a program run by the Iowa Board of Pharmacy and provides authorized providers and pharmacists with information regarding their patients' use of controlled substances. Review of a patient's PMP can give a prescribing doctor information about whether a patient is misusing narcotics. Dr. Andrew was an authorized prescriber in Iowa and had credentials to access the PMP. As a general

surgeon, Dr. Andrew could prescribe opioids to his surgical patients; however, as mentioned, above, he was not a pain specialist. Dr. Andrew testified that opioids and narcotics, like Hydrocodone and Vicodin, can be addictive and present a higher risk of overdose than other types of pain medication. Ms. Ridge wrote a report that summarized her review of T.C.'s PMP and patient charts, and noted the total number of narcotic pills prescribed to T.C. by Dr. Andrew during Dr. Andrew's treatment of T.C. Ms. Ridge reported that she had learned from the pharmacist at HyVee that other local pharmacists had raised similar concerns about Dr. Andrew's care of T.C., but Dr. Andrew contends this statement is hearsay. Ms. Ridge provided her report to Ms. Rathbun, and Ms. Rathbun, in turn, directed Dr. Ehn to review the matter in her role as Medical Director of the VDMC Medical Staff.

Dr. Ehn evaluated T.C.'s PMP, T.C.'s patient chart, and Ms. Ridge's report. Dr. Ehn was concerned because she thought it was unusual for a general surgeon, like Dr. Andrew, to be providing chronic pain management, especially in light of Dr. Andrew's failure to utilize tools, such as the PMP, consultation with a pain specialist, a pain contract, or drug screenings. She also noted that she had "never seen" multiple prescriptions written for narcotics on the same day, which was reflected in the material she reviewed. Dr. Ehn was further concerned at the lack of documentation in T.C.'s patient chart of extensive consultation and counseling prior to T.C.'s right orchiectomy. Dr. Andrew denies that Dr. Ehn's "concerns" were founded on any standard of practice applicable to general surgeons, and he denies that he violated any standard of practice in providing pain medication to T.C.

On December 8, 2016, Dr. Ehn convened a meeting with Dr. Andrew, Ms. Ridge, and Dr. Altman. Dr. Andrew points out that he was the only general surgeon at the meeting, but the defendants point out that nothing in Dr. Andrew's Agreement required that only general surgeons could give feedback to the CEO regarding

employment decisions or a physician's performance. Dr. Ehn led the meeting and discussed Dr. Andrew's care of T.C. In response to questions from Dr. Ehn, Dr. Andrew informed the group that he typically limited his pain management care to postoperative opioid medications, and that his prescription for pain medication for a longer period of time, as in T.C.'s case, was rare. Dr. Ehn also asked whether it was common practice for Dr. Andrew to provide chronic narcotic medication for his patients, and he admitted that it was not. Dr. Andrew also admitted that he did not have T.C. sign a pain management contract, did not query the PMP, and did not obtain a consultation with a urologist prior to surgically removing both of T.C.'s testicles. Dr. Andrew denies that any of these things were required or that he violated a standard of practice.

After the meeting, Dr. Ehn wrote a report, which appears in its entirety at Defendants' Sealed Appendix, 79-82. The defendants contend that the pertinent part of Dr. Ehn's report is the conclusion, which was as follows:

> After reviewing [T.C.'s] chart, associated documentation and interviewing Dr. Andrew, I have remaining concerns about this case. First, it is unusual for a general surgeon to provide chronic pain management. Dr. Andrew states that he felt that [T.C.'s] pain was related to surgical issues, however it is noted several times in the chart that [T.C.'s] pain is likely related to his chronic orthopedic pain, arthritis in his hips and lumbar spine. Second, [T.C.] was prescribed a large amount of pain medication over the last 4 years. This was not adequately monitored by Dr. Andrew. He did not utilize the [prescription] monitoring program and he did not confirm use with urine drug screens. He did not have the patient sign any contract regarding prescription of controlled substances. I continue to have questions regarding the medical treatment of this patient's testicular pain and subsequent bilateral orchiectomy. There does not appear to be any significant discussion about the after effects of a bilateral orchiectomy, the need for testosterone replacement and the risks and

benefits of that. I wonder if a referral for a second opinion about his chronic testicular pain would have been appropriate prior to removing the second testicle. Lastly, the patient appears to have filled duplicate or multiple prescriptions, written on the same day, by Dr. Andrew, for large quantities of opioid medication. This raises questions about whether the patient was fraudulently manipulating prescriptions or if the physician was providing multiple, large quantity prescriptions.

Defendants' Appendix at 81-82.[1]

Dr. Andrew testified that he did not look at the PMP report but, in retrospect, should have, because duplication of prescriptions would have been something that he potentially would have been picked up on a review of the PMP. However, he denies that failure to do so was below a medical standard of care. Dr. Andrew only recalled consulting the PMP once during his employment with VDMC, "initially just when [the PMP] first came out, just from a curiosity standpoint, but no other reason," and he admits that he never consulted the PMP for T.C. When he reviewed T.C.'s PMP at his deposition, Dr. Andrew observed that T.C. appeared to be "double-double or triple-dipping" on single prescriptions that he had written for T.C. and that, had he learned about this issue earlier, he would have "[p]robably discharged [T.C.] from my practice."

---

[1] Although Dr. Ehn's report is provided in the sealed part of the Defendants' Appendix, the parties did not request that their statements of fact, in which the quoted portion appears, be sealed. Dr. Andrew denies that the statement of this paragraph in the defendants' statement of undisputed facts accurately quotes Dr. Ehn's report, but has not identified in what ways it is inaccurate. My review indicates that the only "inaccuracies" in the defendants' quotation of this paragraph are the substitution "[T.C.'s] chart" for "the chart" and the substitution of "T.C." for the patient's name, substitution of "[four] years" for "4 years," and insertion of "physician [sic] monitoring program." I have not adopted those last two alterations in my quotation of the paragraph of the report, here. Rather, I have used "4 years," as stated in the original, and "[prescription] monitoring program," which is the proper name of the program.

Dr. Andrews denies, however, that he ever gave T.C. three prescriptions on the date "at issue."

After reviewing Dr. Ehn's report, Ms. Rathbun was troubled by Dr. Andrew's patient care. More specifically, she was concerned that Dr. Andrew did not have a pain contract with T.C.; about the length of time Dr. Andrew treated T.C., because it was unusually long for his practice; and because it appeared to her that T.C. was seeing Dr. Andrew "as almost his family practice provider or pain specialist." The amount of hydrocodone prescribed to T.C. over a four-year period—approximately 11,940 doses— was also a significant concern for Ms. Rathbun, because she believed it was "excessive" based on consultation with Ms. Ridge, Dr. Ehn, and Dr. Altman. Ms. Rathbun also concurred in Dr. Ehn's concern about the absence of significant discussion by Dr. Andrew with T.C. about the aftereffects of a bilateral orchiectomy, the need for testosterone replacement, and its risks and benefits. However, Dr. Andrew denies the truth of Ms. Rathbun's opinions, denies that she was qualified to offer those opinions, and contends that alleged "overprescribing" is not supported by the opinions of either his expert or the defendants' expert, which the defendants dispute. Dr. Andrew also points out that Ms. Rathbun did not seek input from Dr. Altman and Dr. Ehn on the level of severity of the medical concerns, that is, whether they rose to the level requiring immediate termination, which the defendants admit, although they point out that only Ms. Rathbun had the power to terminate Dr. Andrew.

Ms. Ridge also identified another patient, L.H., whom Dr. Andrew had treated for a cyst over a two-year period, from early 2014 to early 2016, and for whom she believed that Dr. Andrew had assumed pain management care, without reviewing L.H's PMP, utilizing drug testing, or asking her to enter into a pain management contract. Dr. Andrew denies that he assumed pain management care for L.H.; rather, he alleges

that he provided periodic treatment to L.H. related to various surgical complaints. He also denies that it was necessary to take any of the actions identified.

Dr. Andrew alleges that two doctors, hired as experts in this case, have both agreed that the amount of pain medication he prescribed was not unsafe. The defendants admit that Dr. Webster testified that the amounts of opioids prescribed to T.C. and L.H. were not excessive, and that Dr. Ledet testified that the dosage of opioids prescribed for L.H. was not excessive, but that Dr. Ledet testified that the length of time opioids were prescribed for T.C. was improper and a safety concern, and Dr. Ledet identified numerous other problems with Dr. Andrew's plan for the care of these patients. Dr. Andrew alleges, and the defendants admit for purposes of summary judgment, that less than 50% of physicians use the PMP, but the defendants contend that Ms. Rathbun testified that it would be "critical" to use the PMP for anyone who is prescribing narcotics and treating a patient for pain management.

### 5. *The termination and aftermath*

On December 15, 2016, Ms. Rathbun met with Dr. Andrew and informed him that she was terminating his employment because of the amount of medication T.C. had received and "another issue," although Dr. Andrew testified that Ms. Rathbun did not elaborate what the "other issue" was. The defendants admit this statement, but they deny that it is material, because the primary reason was patient safety. At the meeting, Ms. Rathbun gave Dr. Andrew his termination letter. The pertinent portions of the letter stated the following:

> This letter is to inform you that your employment contract with the Hospital is being terminated pursuant to paragraph 9(d). This termination is effective immediately. You will no longer treat hospital and clinic patients. Pursuant to your contract, paragraph 9(h), your medical staff membership at the Hospital also terminates at this time. This will further

> result in the termination of the contract with Iowa Falls
> between the hospital entities relating to your services.
>
> * * *
>
> This action is being taken due to significant concerns about
> prescribing practices and patient care issues. Please be
> advised that these issues have also been reported to the Iowa
> Board of Medicine and Medical Staff for purposes of
> evaluation and Peer Review.

Defendants' Appendix at 78. Ms. Rathbun testified that Dr. Andrew was terminated pursuant to Section 9(d)(i) of his employment agreement. Dr. Andrew denies that the reasons stated for his termination had merit. He alleges, and the defendants admit for purposes of summary judgment, that he was told that his termination was "administrative," and that the cause was the alleged "excessive amount of medication that [T.C.] had received." Dr. Andrew also denies that Ms. Rathbun had the authority to terminate his employment for "professional," as opposed to "administrative," reasons without utilizing the peer review process in the staff bylaws.

At the time of Dr. Andrew's termination, he was 62 years old, and there were 8 months left in the initial term of his Agreement. Prior to his termination, nobody at VDMC had told Dr. Andrew that he was not providing adequate patient care or that the safety of his patients was jeopardized by his conduct. Also, prior to December of 2016, Dr. Ehn had never seen evidence of improper prescribing practices by Dr. Andrew.

Following Dr. Andrew's termination, VDMC hired several physicians from a local practice who were the same age as or older than Dr. Andrew. Dr. Andrew was hired as a full-time surgeon by Iowa Specialty Hospital on January 23, 2017, one month after his termination from VDMC, and continued to work there until August 17, 2017, when his employment was terminated for reasons unrelated to his employment at VDMC. Dr. Andrew has been unable to work since August 17, 2017, and he alleges that, although

he has sought employment with multiple locum tenens companies, he has been unable to secure employment in light of the "for cause" designation for his termination from VDMC. The defendants contend that Dr. Andrew cites only his own testimony about what unidentified representatives of unidentified companies told him were the reasons he was not hired, which is inadmissible hearsay.

## B.    *Procedural Background*

Dr. Andrew filed this lawsuit on May 12, 2017, in the Iowa District Court for Hamilton County. He asserted claims for breach of contract, breach of fiduciary duty, age discrimination in violation of Iowa and federal law, all against VDMC, and defamation against both VDMC and Ms. Rathbun. On June 5, 2017, the defendants removed this action to this federal court, pursuant to 28 U.S.C. §§ 1331 and 1441, based on the federal age discrimination claim, and they asserted that the court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The defendants then filed a joint Answer And Affirmative Defenses on July 7, 2017. In a Trial Management Order, filed August 28, 2017, this case was set for a jury trial beginning on February 11, 2019.

On October 5, 2017, Dr. Andrew filed his First Amended Complaint, which remains his controlling pleading. In it, Dr. Andrew asserts five claims. In **Count I**, he alleges breach of contract by VDMC, based on allegations that his employment Agreement was terminated without cause and without notice and by failing to assure that the established peer review process was utilized before terminating him. In **Count II**, he alleges breach of fiduciary duty by VDMC, based on VDMC's "bypassing" of the well-established method of performing peer review when terminating him. In **Count III**, he alleges age discrimination by VDMC, in violation of both the federal Age Discrimination In Employment Act (ADEA) and the Iowa Civil Rights Act (ICRA), by

terminating him, at least in part, because of his age, after hiring two new, younger, and less-experienced surgeons, and directing that all surgery consults and referrals be sent to the new surgeons. In **Count IV**, he alleges defamation by Ms. Rathbun and VDMC, based on allegations that, on or about December 15, 2016, Ms. Rathbun falsely spoke of and concerning him by stating to the Iowa Board of Medicine and the National Practitioner Data Base that he had provided substandard or inadequate care in prescribing, dispensing, or administering medication. Finally, in **Count V**, he alleges libel *per se* by Ms. Rathbun and VDMC, based on the same allegations that are the basis of **Count IV**. The defendants filed their joint Answer And Affirmative Defenses To Plaintiff's First Amended Complaint on October 10, 2017. Although some discovery deadlines were changed after Dr. Andrew filed his First Amended Complaint, the trial date remained unchanged.

On May 9, 2018, the defendants filed the Motion For Partial Summary Judgment now before me. In that Motion, they seek summary judgment on **Counts II** through **V**, in their entirety, and partial summary judgment on **Count I** to the extent of limiting damages to the 90-day notice period for a "without cause" termination, if a jury determines that Dr. Andrew was terminated in breach of his Agreement, and barring recovery based on the absence of peer review. On May 30, 2018, Dr. Andrew filed his Resistance to summary judgment, in whole or in part, on any of his claims. On June 14, 2018, the defendants filed their Reply.

No party requested oral arguments on the defendants' Motion For Partial Summary Judgment in the manner required by local rules. Moreover, I have found the parties' written submissions to be adequate for the disposition of this motion. Therefore, the defendants' Motion For Partial Summary Judgment is deemed fully submitted on the parties' written submissions.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact *and* that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burdens, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ––– U.S. ––––, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012). However, summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

With these standards in mind, I turn to consideration of the defendants' Motion For Partial Summary Judgment.

## B.    *The Age Discrimination Claims*

Unlike the parties, I will consider, first, the defendants' request for summary judgment on Dr. Andrew's age discrimination claims pursuant to the ADEA and the ICRA in **Count III**, because this court's subject matter jurisdiction is premised on the ADEA claim. Again, the age discrimination claims are based on allegations that Dr. Andrew was terminated, at least in part, because of his age, after VDMC hired two new, younger, and less-experienced surgeons, and directed that all surgery consults and referrals be sent to the new surgeons.

## 1. *Arguments of the parties*

In support of summary judgment in their favor on Dr. Andrew's age discrimination claims, the defendants argue that, although the causation standards differ between federal and state law age discrimination claims, the result is the same under either standard. They point out that Dr. Andrew concedes that there is no direct evidence of age discrimination, so that his age discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework.[2] For purposes of their motion, the defendants do not dispute that Dr. Andrew can make out a *prima facie* case of age discrimination, but they argue that he cannot present sufficient evidence to generate a fact question as to the illegitimacy of VDMC's nondiscriminatory reasons for terminating the Agreement, let alone evidence to suggest that age discrimination was the true reason for his termination.

More specifically, the defendants argue that, after investigation and consultation with Dr. Ehn and Dr. Altman, Ms. Rathbun elected to terminate Dr. Andrew's Agreement immediately, primarily owing to her significant concerns about patient care and safety identified during the investigation. They argue that Dr. Andrew cannot demonstrate that this reason was a pretext for age discrimination, because he admits the facts underlying VDMC's decision. For example, they point out that he admits his long-term prescription of narcotics, such as his treatment of T.C. for four years, was unusual in his general surgery practice, and that it was not common practice for him to assume primary care for a patient's pain management; he admits that he failed to consult the PMP, use a pain management contract, or drug testing to monitor T.C.'s or L.H.'s use of narcotics; he admits that he did not send T.C. to a pain management specialist, despite

---

[2] *See McDonnell Douglas Corp. v. Green*, 411 U.S.792 (1973).

having such a resource available; and he admits that his productivity was well below industry standards and a constant source of concern to Ms. Rathbun. The defendants argue that Dr. Andrew's disagreement with and "second-guessing" of VDMC's view of the seriousness of these issues does not establish age discrimination, because VDMC and Ms. Rathbun had a good faith belief that Dr. Andrew had committed misconduct sufficient to warrant his immediate termination, and Dr. Andrew offers nothing that demonstrates a lack of good faith.

The defendants also contend that Dr. Andrew cannot point to any evidence sufficient to raise a jury question that an age discriminatory animus played any part in VDMC's decision. They dispute the sufficiency of Dr. Andrew's reliance on either the adjustments to his compensation or the hiring of two younger physicians in the months before his termination to demonstrate the required animus. As to compensation, the defendants contend that Dr. Andrew has identified merely a correlation between his high compensation and his age, where his productivity was below industry standards, which justified the reduction in compensation, and he admitted that he did not think those changes were unjustified or age-related. Next, the defendants argue that hiring a younger employee to perform a plaintiff's job duties is not, in and of itself, sufficient to raise an inference of age discrimination, and that Dr. Bedi and Dr. Grimm were both hired for legitimate business reasons. Furthermore, the defendants point out that Ms. Rathbun hired several physicians from a local practice who were the same age or older than Dr. Andrew following the termination of his Agreement.

In response, Dr. Andrew argues that there is no sufficient support for Ms. Rathbun's decision to terminate him. He argues that Ms. Rathbun was not a doctor and was not qualified to determine whether the amounts of medications prescribed to T.C. were excessive. Also, he contends that, while Ms. Rathbun claimed to have relied on Dr. Ehn's report, Dr. Ehn did not offer an opinion prior to his termination on whether

19

the amounts of medications prescribed for T.C. were excessive. On the contrary, he contends, two doctors, hired as experts in this case, agreed that the amount prescribed was not unsafe. Moreover, he argues that Ms. Rathbun engaged in a year-long campaign to drive him out of VDMC, after telling him that he was overpaid, amending his Agreement twice within the three-year period to reduce his compensation, then leasing his services to Hanson Family Hospital and hiring other doctors for VDMC, which prevented him from improving his productivity. Dr. Andrew also asserts that his "admirable" employment history can be used by a jury to infer a discriminatory motive. In short, he contends that a jury could reasonably infer that the proffered reason for his termination was false and, therefore, was simply a pretext for an age discriminatory motive.

In reply, the defendants reiterate that Dr. Andrew is simply arguing that the court should review the wisdom or fairness of VDMC's decision to terminate him. They point out that Dr. Andrew second-guesses Ms. Rathbun's qualifications to terminate him and disagrees with VDMC's opinion on the basis of expert opinions that he reads to say he did nothing dangerous in his prescribing of narcotics, but he cannot dispute that Ms. Rathbun, Dr. Ehn, and Dr. Altman had sincere concerns about his practice in prescribing narcotics. The defendants also contend that Dr. Andrew cannot generate genuine issues of material fact on the basis of Ms. Rathbun's efforts to improve his productivity and the hospital's revenue by leasing his services to Hanson Family Hospital, where he admits productivity and revenue were within her purview. As to Dr. Andrew's allegedly "admirable" employment history, the defendants point out that they were entitled to rely on recent performance problems more heavily than on past good performance.

### 2. Analysis

#### a. Applicable standards

As the Eighth Circuit Court of Appeals explained, in a decision involving claims of age discrimination in violation of both the ADEA and the ICRA,

> Both statutes provide a right of action for an employee who is terminated "because of" his age. 29 U.S.C. § 623(a)(1); Iowa Code § 216.6(1)(a). The statutes require slightly different showings of causation, *compare Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 178, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009) (ADEA plaintiff must show that age discrimination was a "but[ ] for" cause of his termination) *with DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009) (ICRA plaintiff need only show that age discrimination was a "motivating factor").

*Ridout v. JBS USA, L.L.C.*, 716 F.3d 1079, 1083 (8th Cir. 2013). Although the causation standards differ, "under either the ADEA or ICRA, [courts] apply the familiar *McDonnell Douglas* test." *Id.* Thus, under either statute, at the final stage of the burden-shifting analysis, which is at issue here, if the employer meets its burden to articulate a legitimate nondiscriminatory reason for its actions, "the presumption of discrimination dissolves and the burden returns to the plaintiff to demonstrate that the proffered reason is a mere pretext for age discrimination." *Id.*

When deciding whether an age discriminatory animus was the real reason for an employer's decision, "[c]ourts 'may not second-guess employers' business decisions,' . . . and 'employers are free to make employment decisions so long as they do not discriminate unlawfully.'" *Robinson v. American Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014) (quoting *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 471 (8th Cir. 2011)). Thus, "[t]o defeat summary judgment, [the employee] 'must present affirmative evidence, not simply contend that a jury might disbelieve [the employer's] evidence.'" *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 886 (8th Cir. 2016) (quoting

*Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 428 (8th Cir. 1999)); *Wagner v. Gallup, Inc.*, 788 F.3d 877, 888 (8th Cir. 2015) ("'A party's unsupported self-serving allegation that her employer's decision was based on [age discrimination] does not establish a genuine issue of material fact.'" (quoting *Gibson v. American Greetings Corp.*, 670 F.3d 844, 857 (8th Cir. 2012)). To meet his or her evidentiary burden, "'[a] plaintiff may show that the employer's explanation is unworthy of credence because it has no basis in fact [or] may show pretext by persuading the court that a prohibited reason more likely motivated the employer.'" *Aulick v. Skybridge Americas, Inc.*, 860 F.3d 613, 621 (8th Cir. 2017) (quoting *Torgerson*, 643 F.3d at 1047).

As the Eighth Circuit Court of Appeals has explained, where, as here, an employee was terminated for specific misconduct, "'[t]he critical inquiry . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" *Blackwell v. Alliant Techsystems, Inc.*, 822 F.3d 431, 436 (8th Cir. 2016) (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861–62 (8th Cir. 2009)). Where the employer has corroboration for a claim of misconduct, and apparently believes in good faith that the employee engaged in the misconduct, "there is no genuine factual dispute as to 'whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination.'" *Id.* (quoting *McCullough*, 559 F.3d at 862).

Evidence that a younger person replaced the plaintiff or was treated more leniently for similar misconduct, while sufficient at the *prima facie* stage, is insufficient to establish pretext, because it has insufficient probative value to persuade a reasonable jury that the plaintiff was discriminated against because of his or her age and not treated adversely for a legitimate reason. *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 719-20 (8th Cir. 2012) (citing *Carragher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007)); *Tusing v.*

*Des Moines Indep. Comm. Sch. Dist.*, 639 F.3d 507, 517 (8th Cir. 2011) (also sighting *Carragher*, 503 F.3d at 719, for this principle). Similarly, as a general matter, "'employment decisions motivated by factors other than age (such as retirement eligibility, salary, or seniority), even when such factors correlate with age, do not constitute age discrimination,'" but "this is true only if these factors, although usually correlated, are wholly independent from age." *Hilde v. City of Eveleth*, 777 F.3d 998, 1006 (8th Cir. 2015) (quoting *Cooney v. Union Pac. R.R. Co.*, 258 F.3d 731, 735 (8th Cir. 2001)). On the other hand, "[p]retext can also be demonstrated by showing that . . . the employer deviated from policies." *Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1013, 1017 (8th Cir. 2017) (citing *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006)). There must, however, be evidence to support an allegation of failure to follow ordinary disciplinary procedures, not merely conclusory arguments, to generate a genuine issue of material fact on pretext. *Id.* at 1019.

Finally, for present purposes, as to pretext, evidence "'may show that [the plaintiff] had performed competently in the past, but [such evidence] do[es] not render [the plaintiff's] more recent negative evaluations inherently untrustworthy.'" *Doucette v. Morrison Cty., Minn.*, 763 F.3d 978, 983 (8th Cir. 2014) (quoting *Rose–Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998)). Such evidence of past good performance "does not create an issue of material fact regarding the [employer's] intent in firing [the plaintiff]," because "'employers may choose to rely on recent performance more heavily than past performance.'" *Id.* (quoting *Twiggs v. Selig*, 679 F.3d 990, 994 (8th Cir. 2012)).

### b.     *Application of the standards*

This is not a case in which a rational fact finder could find for Dr. Andrew on the question of whether the defendants' proffered reason for his termination is a mere pretext for age discrimination. *Torgerson*, 643 F.3d at 1042-43 (stating the "rational fact finder"

standard for summary judgment standard); *Ridout*, 716 F.3d at 1083 (stating the "mere pretext" standard as the ultimate burden to prove age discrimination). First, Dr. Andrew's evidence is insufficient to generate a fact question on whether the defendants' explanation for their decision is unworthy of credence on the ground that it has no basis in fact. *Aulick*, 860 F.3d at 621 (stating this as the first way to establish discrimination). The experts in this case do not agree, as Dr. Andrew contends they do, that the amount of narcotics that he prescribed for T.C. was not unsafe. Dr. Ledet did agree that the dosage of opioid prescribed by Dr. Andrew would not generally be considered excessive, Plaintiff's Appendix at 29 (Deposition of Dr. Ledet, 38:1-6), and that prescribing of the specific dosages of opioid to T.C. for his chronic condition was not uniquely inappropriate, meaning that daily dosages were not inappropriate, Defendants' Supplemental Appendix at 136 (Deposition of Dr. Ledet, 51:4-25). Dr. Ledet was critical, however, of the long period of time that T.C. was prescribed opioids, Dr. Andrew's failure to develop a pain management plan for L.H. and T.C., and his failure to pursue other potential causes of T.C.'s pain, failure to use other non-opioid therapies, and failure to monitor T.C.'s use of pain medications through the PMP, a pain management agreement, or urine testing. *Id.* at (Deposition of Dr. Ledet, 52:1-54:19).

Moreover, even if there is a fact question about whether Dr. Andrew correctly treated L.H. and T.C. based on a disagreement between the experts, Dr. Ledet and Dr. Webster, that does not establish that the defendants' reasons for terminating Dr. Andrew are unworthy of credence. That is so, because the question in a case, such as this, involving termination for misconduct, is "whether the employer in good faith believed that the employee was guilty of the conduct justifying the discharge." *Blackwell*, 822 F.3d at 436 (internal quotation marks and citations omitted). Dr. Ledet's opinions are *post hoc* evidence that the defendants had a reasonable, *i.e.*, good faith, basis for

their determination that Dr. Andrew's prescribing practices and patient care posed a threat to patient safety. Still more importantly, prior to Dr. Andrew's termination, the defendants had conducted an investigation that corroborated concerns about his prescribing practices and patient care.[3] *Id.* Ms. Ridge's initial investigation produced evidence of prescribing and patient care practices justifying concern, but Ms. Rathbun then required further investigation, by Dr. Ehn, including the meeting involving Dr. Andrew, Dr. Ehn, Dr. Altman, and Ms. Ridge and Dr. Ehn's subsequent report. Although Dr. Andrew contends that Ms. Rathbun was not qualified to make a determination on a patient care issue, he admitted that her duties as CEO included managing VDMC, hiring physicians, promoting patient safety and quality of care, negotiating employment contracts, and terminating VDMC employees, and that she frequently made decisions that involved medical issues.

Although "[p]retext can also be demonstrated by showing that . . . the employer deviated from policies," *Sieden*, 846 F.3d at 1017, Dr. Andrew's contention that he was terminated without using the hospital staff peer review process, which was established by the hospital's bylaws, does not generate a genuine issue of material fact on pretext in this case. This is so because Dr. Andrew has only a conclusory argument that such a peer review process was applicable to him, which is not supported by the evidence. *See id.* (holding conclusory allegations of failure to follow established policy are not enough to generate a jury question). As the defendants point out, the last sentence of § 9(h) of Dr. Andrew's Agreement states,

> Termination of Physician's employment shall be governed
> solely by this Agreement and shall not be subject to the

---

[3] Although Dr. Andrew contends that the evidence that a pharmacist drew the hospital's attention to Dr. Andrew's prescriptions is hearsay, I disagree. That evidence is not offered for its truth, but to show how the defendants received notice of a possible problem with Dr. Andrew's prescriptions. *See* FED. R. EVID. 801(c).

> corrective action, termination or grievance procedures
> applicable to other employees of Hospital or to the hearing
> and appeal procedures set forth in the medical staff bylaws.

Defendants' Appendix at 101 (Agreement, § 9(h), last sentence). The defendants reasonably read this provision as exempting Dr. Andrew's termination from the peer review process in the hospital bylaws, whether or not their interpretation is correct as a matter of law, so that they were following what they believed was an appropriate procedure, so their conduct was not pretextual. Whether or not Dr. Andrew is correct about his belief that the peer review process was required is a matter to be decided in his breach of contract and breach of fiduciary duty claims.

Dr. Andrew's other attempts to generate genuine issues of material fact on pretext fare no better. Dr. Andrew claims that the defendants hired two younger, less experienced surgeons to take over some of his duties prior to his termination, but that evidence has insufficient probative value to persuade a reasonable jury that Dr. Andrew was discriminated against because of his age, rather than terminated for the misconduct cited by the defendants. *See Onyiah*, 684 F.3d at 719-20. This is particularly true, here, where the defendants have offered legitimate reasons for hiring additional surgeons that fall well within their business judgment—the need for surgeons to cover on call and OB/GYN needs while Dr. Andrew was providing services to Hanson Family Hospital and the need to prepare for continuity of services after Dr. Andrew's eventual retirement—and Dr. Andrew has pointed to nothing to rebut those stated reasons. *See Robinson*, 753 F.3d at 754 (explaining that courts may not second-guess an employer's business decisions so long as they are not discriminatory). Furthermore, Dr. Andrew's allegation that one of those surgeons, Dr. Grimm, was to be given *all* surgical referrals is not supported by the email from Ms. Rathbun on which Dr. Andrew relies. Rather, that email actually states, "[R]eferrals were supposed to go to [Dr.] Grimm *if she is here* as she will be primary at this hospital," and it continues, "Of course, if [Dr. Andrew]

has a patient who requests him that is another thing altogether." Plaintiff's Sealed Appendix at 40 (emphasis added). Thus, there is no inference that Ms. Rathbun was attempting to direct *all* referrals to Dr. Grimm instead of Dr. Andrew. Also, as the defendants point out, Ms. Rathbun hired several physicians from a local practice who were the same age or older than Dr. Andrew following the termination of his Agreement, which defeats any inference of age discrimination. *Cf. Onyiah*, 684 F.3d at 719-20 (hiring younger replacements is not enough to generate a genuine issue of material fact on pretext).

Dr. Andrew also points to Ms. Rathbun's alleged hostility to his low productivity and high pay as demonstrating that he was terminated, at least in part, because of his age. As a general matter, however, employment decisions motivated by a factor, such as salary, which often correlate with age, do not constitute age discrimination, if that factor is wholly independent of age. *See Hilde*, 777 F.3d at 1006. Dr. Andrew has pointed to nothing reasonably suggesting that Ms. Rathbun was concerned about, or hostile toward, his *age*, rather than toward the wholly independent discrepancy between his low productivity and his high pay, for which the record does provide ample evidence.

Finally, Dr. Andrew points to his "admirable" employment history as a basis for inferring a discriminatory motive for his termination for misconduct. No rational trier of fact could so conclude, however, because such evidence does not render Dr. Andrew's more recent negative evaluation of his prescribing and patient care practices inherently untrustworthy or pretextual, nor does it create a genuine issue of material fact, because "employers may choose to rely on recent performance more heavily than past performance." *Doucette*, 763 F.3d at 983 (internal quotation marks and citations omitted). Again, the defendants' reliance on concerns about Dr. Andrew's prescribing and patient care practices were in good faith and corroborated. *See Blackwell*, 822 F.3d at 436.

In short, Dr. Andrew has simply contended that a jury might disbelieve the defendants' evidence of the reasons for their decision to terminate his employment, which is not enough to defeat summary judgment. *See Haggenmiller*, 837 F.3d at 886. The part of the defendants' Motion For Partial Summary Judgment seeking summary judgment on Dr. Andrew's age discrimination claims under the ADEA and the ICRA is **granted**.

### C. Retention Of Jurisdiction

Although neither party raised the issue, the dismissal of the only federal claim upon which this court's original jurisdiction (and removal) depends, raises the question of whether I should retain supplemental jurisdiction over the remaining state law claims. If I retain supplemental jurisdiction, I should turn to consideration of the defendants' Motion For Partial Summary Judgment as it relates to those claims. On the other hand, if I decline to exercise supplemental jurisdiction, and remand this action to state court, I should do so before reaching the question of whether summary judgment is appropriate on those state law claims, as a matter of comity.

As the Eighth Circuit Court of Appeals recently explained,

> Federal courts "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). "[I]t is well established—in certain classes of cases— that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005).
>
> But "Congress unambiguously gave district courts discretion in 28 U.S.C. § 1367(c) to dismiss supplemental state law claims when all federal claims have been

dismissed." *Gibson v. Weber*, 431 F.3d 339, 342 (8th Cir. 2005). By § 1367(c):

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1059–60 (8th Cir. 2018).

Thus, pursuant to § 1367(c)(3), "the District Court may well find that [a] case, now raising only state-law issues, should . . . be remanded to the state courts for determination." *Lapides v. Board of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 624 (2002). Although whether or not to dismiss remaining state law claims pursuant to § 1367(c)(3) is a matter in the district court's discretion, *see In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d at 1060, and is reviewed for abuse of that discretion, *see Carlsbad Tech., Inc. v. HIF Bio., Inc.*, 556 U.S. 635, 640 (2009), where "resolution of the remaining claims depends solely on a determination of state law, the [district court] should decline to exercise jurisdiction," *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 749 (8th Cir. 2009). Indeed, the district court may remand after granting summary judgment on the only federal claim or claims, even if the state law issues had been briefed and discovery had been completed. *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60*, 647 F.3d 754, 767 (8th Cir. 2011) (stating that the fact that the issues had been

briefed and discovery had been completed "does not affect our conclusion" that the district court did not abuse its discretion in remanding remaining claims to state court after granting summary judgment on the only federal claim).

To put it another way, "'[w]hen a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually will point toward declining to exercise jurisdiction over the remaining state law claims." *Streambend Properties II, L.L.C. v. Ivy Tower Minneapolis, L.L.C.*, 781 F.3d 1003, 1016–17 (8th Cir. 2015) (quoting *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 792 (8th Cir. 2006)). The Supreme Court identified the interests in question as follows:

> Under [*Mine Workers v.] Gibbs*, [383 U.S. 715 (1966)], a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims.

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Here, I have dismissed the only claim on which federal jurisdiction depended, and this case now raises only state law issues, so that remand to state court is certainly within my discretion. *See* 28 U.S.C. § 1367(c)(3); *Lapides*, 535 U.S. at 624; *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d at 1060. More specifically, still, "resolution of the remaining claims depends solely on a determination of state law," so that I "should decline to exercise jurisdiction." *Glorvigen*, 581 F.3d at 749. This is so, even though the state law issues have been briefed and discovery has been completed. *D.J.M.*, 647 F.3d at 767.

Furthermore, this case presents a circumstance in which the balance of interests not only usually point toward declining to exercise jurisdiction over the remaining state law claims, *see Streambend Properties II, L.L.C.*, 781 F.3d at 1016-17, but one in which

they plainly do. Judicial economy is the only *Gibbs* factor that is likely a wash. *See Carnegie-Mellon Univ.*, 484 U.S. at 350 (first *Gibbs* factor). Convenience of the parties, *id.* (second *Gibbs* factor), will be best served by remand, where the Iowa District Court for Hamilton County sits in Webster City, which is where many or most of the parties and witnesses are likely to reside, and Webster City is closer than Sioux City, where this court sits, to the offices of any of the attorneys, which are in Des Moines or Cedar Rapids. Fairness, the next *Gibbs* factor, *see id.*, is also served, because state law claims will be heard, in the first instance, in state court and, if necessary, appealed to the Iowa Supreme Court, which can answer state law questions authoritatively, *cf. Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1977) (explaining that certification of state law questions to the state Supreme Court "increase[es] the assurance of gaining an authoritative response"), and there is no reason to believe that a state forum will be less fair to one side or the other when all parties are citizens of this state. Finally, as a matter of comity, the last *Gibbs* factor, *see Carnegie-Mellon Univ.*, 484 U.S. at 350, it is appropriate for this court to cede to the state courts questions of state law.

Therefore, I will not reach the remaining portions of the defendants' Motion For Partial Summary Judgment, but will remand this action to state court for determination of the remaining state law claims.

## III.    CONCLUSION

Upon the foregoing,

1.    The defendants' May 9, 2018, Motion For Partial Summary Judgment (docket no. 32) is **granted in part and denied without prejudice in part**, as follows:

      a.    The part of the defendants' Motion seeking summary judgment on the plaintiff's age discrimination claims pursuant to the ADEA and the ICRA in

**Count III** of the First Amended Complaint is **granted**, and summary judgment on that claim shall enter accordingly; but

      b.    The remaining parts of the defendants' Motion, seeking partial summary judgment on **Count I** and summary judgment on the entirety of **Counts II, IV,** and **V,** is **denied without prejudice**.

2.    The remaining claims, in **Counts I**, **II**, **IV**, and **V**, are **remanded** to the Iowa District Court for Hamilton County.

**IT IS SO ORDERED**.

**DATED** this 30th day of August, 2018.

 

*Mark W. Bennett*

_____

MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA